# UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF
## NEW YORK

| | | |
|---|---|---|
| WASIM G. MANASFI, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. _____ |
| | ) | |
| v. | ) | |
| | ) | |
| CONTROL4 CORPORATION, MARTIN | ) | |
| PLAEHN, MARK E. JENSEN, PHIL | ) | |
| MOLYNEUX, JOHN R. BORN, JAMES T. | ) | |
| CAUDILL, JEREMY A. JAECH, DAVID C. | ) | |
| HABIGER and MARIA THOMAS, | ) | |
| | ) | |
| Defendants. | | |

## COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

Plaintiff, Wasim G. Manasfi, by his undersigned attorneys, for this complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel, as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.       This is an action brought by Plaintiff against the Control4 Corporation ("Control4" or the "Company")  and the members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with Control4, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a) respectively, and United States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9.  Plaintiff's claims arise in connection with the proposed acquisition of Control4 by Wirepath Home Systems, LLC ("Parent") and

1

Copper Merger Sub Inc. ("Merger Sub") (collectively, "SnapAV") (the "Proposed Transaction").

2.      On May 8, 2019, Control4 entered into an agreement and plan of merger (the "Merger Agreement"), whereby stockholders of Control4 common stock will receive $23.91 in cash for each share of Control4 stock they own (the "Merger Consideration").

3.      On June 7, 2019, in order to convince Control4's public common stockholders to vote in favor of the Proposed Transaction, the Defendants authorized the filing of a materially incomplete and misleading Schedule 14(a) Proxy Statement (the "Proxy") with the Securities and Exchange Commission ("SEC").

4.      In particular, the Proxy contains materially incomplete and misleading information concerning: (i) financial projections for the Company; (ii) analyses completed by Control4's financial advisor with respect to the Proposed Transaction, Raymond James & Associates, Inc. ("Raymond James"); and (iii) potential conflicts of interest on the part of Raymond James.

5.      The Proposed Transaction is expected to be completed in the second half of 2019 and the special meeting of Control4's stockholders to vote on the Proposed Transaction can be scheduled at any time (the "Stockholder Vote").   It is therefore imperative that the material information that has been omitted from the Proxy is disclosed prior to the Stockholder Vote so Control4's stockholders can properly exercise their corporate voting rights.

6.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9. Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to Control4's public common stockholders sufficiently in advance of the upcoming stockholder vote or, in the event the Proposed Transaction is consummated, to recover damages resulting from the

Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

8.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under the traditional notions of fair play and substantial justice.  "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state."  *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985).  "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court."  *Id.* at 1316.

9.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78a, as well as 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District.  Indeed, Control4's common stock trades on the Nasdaq Global Select Market, which is also headquartered in this District.  *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).  Further, Control4 has retained D.F. King & Co., Inc. as its Proxy Solicitor, which is located in this District at 48 Wall Street, 22nd Floor, New York, NY 10005.

## PARTIES

10.     Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Control4 common stock.

11.     Defendant Control4 is a Delaware corporation and maintains its principal executive office at 11734 S. Election Road, Salt Lake City, Utah 84020.   The Company's common stock trades on the Nasdaq Global Select Market under the ticker symbol "CTRL."

12.     Individual Defendant Martin Plaehn ("Plaehn") is and has been Control4's President and Chief Executive Officer and a member of its Board since September 2011, and chairperson of the Board since January 1, 2014.

13.     Individual Defendant Mark E. Jensen ("Jensen") is and has been a member of Control4's Board since April 2015.

14.     Individual Defendant Phil Molyneux ("Molyneux") is and has been a member of Control4's Board since April 2015.

15.     Individual Defendant John R. Born ("Born") is and has been a member of Control4's Board since June 2011.

16.     Individual Defendant James T. Caudill ("Caudill") is and has been a member of Control4's Board since October 2014.

17.     Individual Defendant Jeremy A. Jaech ("Jaech") is and has been a member of Control4's Board since May 2014.

18.     Individual Defendant David C. Habiger ("Habiger") is and has been a member of Control4's Board since September 2012.

19.     Individual Defendant Maria Thomas ("Thomas") is and has been a member of Control4's Board since February 2018.

20.     The defendants identified in paragraphs 12 through 19 are collectively referred to herein as the "Board" or the "Individual Defendants," and together with Control4, the "Defendants."

## SUBSTANTIVE ALLEGATIONS

**Background of the Company and the Proposed Transaction**

21.     Control4 provides home and small business solutions in order to provide consumers with the ability to integrate audio, video, lighting, temperature, security, communications, network management, and other functionalities into a unified automation solution, customized to match their lifestyles and business needs.

22.     Control4's growth since its founding has been exemplary.  As noted in a May 2, 2019 Seeking Alpha article entitled *Booming Growth In Smart Home Market Makes Control4 A Smart Choice:*

> Control4 has seen its revenue double from just under $150M in 2015 to guidance of ~$300M in 2019. Adjusted EBITDA has almost tripled from $14M in 2014 to ~$40M in FY 2018. Adjusted EBITDA margin increased by 500 bps to 14.6% in FY 2018. Finally, and most importantly, the installed base of homes with Control4 systems has more than doubled from 180,000 homes at the end of 2014 to 385,000 homes at the end of 2018. One of the, if not the, most significant parts of the bullish thesis for Control4 is around the company's installed base and the ability to monetize that growing installed base in the future (which the market is ignoring from a valuation standpoint today). The market values Control4 entirely as a book to bill hardware business without any stickiness from its current installed base or opportunity for future product upgrades or bolt on software service offerings.

23.     More specifically, after noting that Control4 shares traded between $22 and $36 per share for the better part of 2017 and 2018, the May 2, 2019, article focused on four strategic recent initiatives by Control4, which will drive continued business expansion:

- ■ the company made a somewhat quiet but in my opinion very important acquisition of a company called NEEO in February 2019. NEEO was the most funded smart home project in the history of kick-starter campaigns. The company's product was a smart remote that was envisioned to last for months without charging, have patented

technology to sense the user based on recognizing the palm/hand holding the remote, and had an impressive user interface. Early versions of the product were beautiful but the software was glitchy. Control4 immediately ceased selling the NEEO remote when the company was acquired. It's pretty clear that a new remote will be launched and if it is launched this year that is a massive revenue/earnings upside to the current guidance.

■ In mid-2018, without much fanfare outside of the home automation industry, Control4 hired Charlie Kindel to be the SVP of Product and Services. Typically an SVP hire is no big deal, but in this case, Control4 hired the guy that "created, led, and grew Amazon's Alexa Smart Home division" as noted in the press release.

■ Control4 began working directly with national and regional homebuilders in early 2018 to make their products standard in the homes built by these companies. In connection with this effort, in early 2018 the company launched an entry-level product that retailed for $350. This controller was targeted for more of a single room application (i.e., thermostat, doorbell, security system). It provided the perfect opportunity to begin to penetrate the new home market and build the overall install base.

■ In May of 2018 Control4 launched its Certified Showroom program with dealers both in the US and internationally. The initial launch included 140 dealers and as of the March 2019 Cowan conference, over 200 dealers were operating Certified Showrooms with 50 more in the process of opening up.

24.     Therefore, the Proposed Transaction comes at a time when Control4's recent and future success was not fully reflected by its share price. The Proposed Transaction will cash-out Control4 stockholders at a price that fails to adequately compensate them for the intrinsic value of their shares.

25.     Despite Control4's intrinsic value and growth prospects, the Individual Defendants are agreeing to sell the Company and depriving its stockholders of the ability to partake in the Company's future growth.  The Individual Defendants breached their fiduciary duties owed to the Company's stockholders by agreeing to the Proposed Transaction for the unfair Merger Consideration, and by allowing the unfair and flawed sales process to unfold in the manner that it did, which will cause Plaintiff to receive an inadequate Merger Consideration.

26.     Control4 and SnapAV have had merger discussions since 2015.  Indeed, in

December 2015, the Company executed a still active engagement letter formalizing Raymond James' engagement to act as financial advisor to the Board in evaluating potential strategic transactions.   Control4's discussions with SnapAV proved inconclusive based in part on the Company's belief that its "standalone prospects would provide superior long-term value creation for the Company's stockholders through continuing to execute its business plan." Proxy at 36.

27.     Discussions with SnapAV resumed in early 2019. On February 6, 2019, Control4 and SnapAV entered into a mutual confidentiality agreement, which "contained customary provisions, including a one-year standstill provision that applied to Parent and certain of its affiliates, including Hellman & Friedman, which allowed Parent to make confidential proposals to the Company at any time and automatically terminated upon the Company's execution of a definitive agreement with a third party to effect a sale of the Company." *Id.* at 37.

28.     On March 12, 2019, SnapAV delivered a written non-binding proposal to acquire Control4 for $23.00 to $25.00 per share in cash. *Id.*

29.     On March 14, 2019, the Board met to discuss SnapAV's proposal and the Board established a "Transaction Committee" comprised of Defendants Habiger, Jensen and Caudill. *Id.* at 38.

30.     Later that same day, March 14, 2019, Raymond James contacted SnapAV and indicated that the Board had an interest in pursuing a transaction at the upper end of the range proposed by Parent, with a 60-day go-shop period and a 1.0% go-shop termination fee. *Id.* at 39. SnapAV insisted that, in light of the Board's request for a go-shop, it "wanted assurance that the Board would not actively solicit offers for the Company prior to execution of a merger agreement with Parent. Following this discussion, at the direction of the Board, representatives of Raymond James and Goodwin provided such assurances to representatives of Parent . . ." *Id.*

31.     On April 5, 2019, Control4 entered into a confidentiality agreement with "Party B" (which had contacted Control4 with an expression of interest earlier in March 2019), which contained "customary provisions, including a one-year standstill provision that automatically terminated upon the Company's execution of a definitive agreement with a third party to effect a sale of the Company." *Id.* at 41.

32.     On April 10, 2019, SnapAV contacted Raymond James and presented a verbal revised proposal to acquire Control4 for $21.50 per share in cash. *Id.*

33.     On April 15, 2019, Party B contacted Raymond James to request a meeting where "Raymond James could help educate Party B on the Company's industry," which was scheduled for April 26, 2019. *Id.* at 42.

34.     On April 18, 2019, SnapAV submitted a "revised, written, non-binding proposal to acquire the Company for $23.50 per share in cash." *Id.*

35.     On April 19, 2019, SnapAV indicated that it would improve the offer price to $24.00 per share in cash. *Id.* at 44.

36.     On April 22, 2019, Raymond James received an inquiry from "Party C," which expressed interest in a potential transaction with SnapAV. *Id.* at 45. On April 24, 2019, Party C requested additional publicly available information about Control4 and its business. Raymond James informed Party C that Control4 was expecting to reach an agreement for a strategic transaction with a third party in the next couple of weeks and Party C indicated it was unlikely to be interested in exploring a potential transaction under that timetable. *Id.*

37.     On April 25, 2019, Raymond James contacted Party B and indicated that Control4 was expecting to reach an agreement for a strategic transaction with a third party in the next couple of weeks and Party B responded that it would not be interested in exploring a potential

transaction with the Company under that timetable and cancelled the meeting with Raymond James scheduled for April 26, 2019. *Id.*

38.     On April 27, 2019, Raymond James provided to the Board a disclosure letter regarding its relationships with SnapAV and its affiliates. *Id.* at 46.  The letter indicated that Raymond James and its affiliates had provided financial advisory, underwriting and/or asset management services to portfolio companies and controlled affiliates of SnapAV's financial owner Hellman & Friedman during the prior two years. *Id.*  "The Board considered the disclosure letter and concluded that the matters disclosed therein would not impact Raymond James' ability to act effectively as financial advisor to the Company or the Company's decision to continue to retain Raymond James." *Id.*

39.     On May 1, 2019, SnapAV had discussions with "three of the Control4's executive officers (Jeff Dungan, Senior Vice President, Supply Chain Operations and Business Development, Bryce Judd, Senior Vice President, Global Sales and Charles Kindel, Senior Vice President, Products & Services, who are referred to in this proxy statement as the "rollover employees") about their willingness to enter into agreements concurrently with the execution of the merger agreement under which they would agree to invest a portion of their equity interests in the Company in exchange for equity interests of an indirect parent entity of Parent in lieu of receiving merger consideration in respect thereof." *Id.*

40.     The next day, May 2, 2019, SnapAV and Defendant Plaehn had a "telephone discussion regarding Mr. Plaehn potentially joining the board of directors of the combined company and being available following the closing on an advisory basis to provide strategic advice and oversight from that role and perspective." *Id.*

41.     On May 8, 2019, SnapAV verbally presented to Raymond James a "revised

proposal for the acquisition of the Company at a price of $23.91 per share in cash that permitted

the new hire grants, 401(k) shares, director grants, and included a 30-day go-shop period with a

1.5% go-shop termination fee." *Id.* at 48.  Later that day, the SnapAV and Control4 executed the

Merger Agreement. *Id.* at 49.

      42.     On May 9, 2019, prior to the opening of trading on the NASDAQ, the Control4

and SnapAV issued a joint press release, which stated, in part:

> CHARLOTTE, N.C.  &  SALT LAKE CITY  --  (BUSINESS WIRE)--**May 9, 2019**--
> SnapAV, a leading manufacturer and primary source of A/V, surveillance, networking
> and remote management products for professional integrators, and Control4
> Corporation  (NASDAQ: CTRL) ("Control4"), a leading global provider of smart home
> solutions, today announced that they have entered into a definitive merger agreement (the
> "Agreement") whereby SnapAV will acquire  Control4 in an all-cash transaction
> for  $23.91  per share in cash, representing an aggregate value of approximately  $680
> million.
>
> This highly complementary combination will leverage the increased resources of the two
> companies to provide integrators with a true one-stop shop, offering a complete product
> portfolio of custom smart-home, control and automation solutions. Together, SnapAV
> and Control4 will drive increased innovation, simplified integration and compelling
> solutions that meet the demands of today's expanding smart home industry. With leading
> technology solutions, a broad geographic footprint and exceptional service organizations,
> the combined company is poised to provide integrators with better opportunities to serve
> customers in the connected home and business markets.
>
> Control4's Board of Directors has unanimously approved and recommended that
> stockholders vote in favor of the transaction. Under the terms of the Agreement, SnapAV
> will acquire all the outstanding common stock of Control4 for $23.91 per share in cash.
> The purchase price represents a premium of approximately 40% over Control4's closing
> price on May 8, 2019, the last trading day prior to execution of the Agreement, and a
> premium of approximately 38% over Control4's 30-trading day weighted average share
> price ended on May 8, 2019. Private equity investment firm Hellman & Friedman—
> SnapAV's majority shareholder since 2017—will invest additional equity as part of the
> transaction and be the majority shareholder of the combined company.
>
> As award-winning industry leaders renowned for quality, service and continuous
> innovation, SnapAV and  Control4  share a deep understanding of and commitment to the
> custom installation industry and are dedicated to making professional integrators more
> successful. By merging, SnapAV and Control4 will combine the talent of their collective
> 1,200+ employees, market-leading solutions, exceptional interoperability and channel
> platform, dealer-first programs, global distribution and financial resources to deliver

value in ways no one else can—enabling integrators to serve their customers better and grow their businesses.

"We have pursued the mission of making our integrators' lives easier since SnapAV was founded," said John Heyman, chief executive officer of SnapAV. "Dealers will be able to buy leading solutions, access the best service technicians in the industry and experience simpler installation through purchasing, support and seamless product integration.

"Over the past several years, we have accomplished a number of goals we felt were critical to the success of integrators and the continued growth of SnapAV—including offering local delivery and pick-up through the acquisition of distribution sites around the country and expanding the suite of products available to support integrators. Merging with Control4 and its outstanding team will help us execute on our third critical goal: delivering the industry's leading automation platform that integrates with the numerous technologies and products required to create customized smart home experiences homeowners desire. Control4 offers a leading automation platform, along with key smart home solutions in the audio, video, lighting, security and networking categories. We are especially excited by the fact that both of our companies have similarly strong "customer first" corporate cultures centered on quality, service and innovation, and we look forward to creating new and exciting opportunities for the teams at both Control4 and SnapAV. In sum, the two companies will be better together, with better service, better solutions and better opportunities for integrators and employees."

"We believe today's announced transaction delivers compelling and immediate value to Control4 shareholders in the form of a significant share price premium, and we are excited to have the opportunity to join with the SnapAV team," said Martin Plaehn, chairman and chief executive officer of Control4. "Together with SnapAV, we will be able to invest even more in innovation, bring together and build upon the very best of our combined capabilities, and do so with improved reliability, responsiveness, security, and privacy for consumers. Today's announcement will enable us to better serve the expanding smart home market, making the lives of integrators easier and their businesses more effective and efficient."

Together the combined company will bring a deep understanding of the industry and an unmatched passion for providing best-in-class solutions and service with one objective: create better experiences for consumers and the integrators who serve them. Product integration, remote management, expert service technicians, product simplification, training and timely logistical capabilities will ensure every install is easier, more reliable and delivers fantastic experiences to consumers where they live and work.

"The combination of Control4 and SnapAV is transformative for the smart home industry," said Erik Ragatz, Partner at Hellman & Friedman and chairman of the Board of Directors of SnapAV. "The increased resources of the combined company will enable it to invest more to drive innovation and deliver best-in-class features, functionality and products. This combination will also allow us to support integrators more effectively than ever before in pursuit of our joint goal of bringing the promise of the connected home to life."

More than 1,200 employees of the combined company will be led by SnapAV CEO John Heyman and an executive team made up of leaders from both SnapAV and Control4. Control4 CEO Martin Plaehn will join the Board of Directors of the combined company, helping to ensure a smooth integration of the businesses. The merger reflects the value created by bringing together two industry-leading teams of employees who, united, can better serve the needs of the growing smart home segment. The company will share joint headquarters in Charlotte, North Carolina, and Salt Lake City, Utah, with offices and local facilities around the globe.

Transaction Details

As part of the Agreement, Control4's Board of Directors, with the assistance of its advisors, will conduct a 30-day "go-shop" process following the date of the execution of the definitive agreement, during which it will actively initiate, solicit, encourage and evaluate alternative acquisition proposals, and potentially enter into negotiations with any parties that offer an alternative acquisition proposal. Control4 will have the right to terminate the merger agreement to accept a superior proposal, subject to the terms and conditions of the merger agreement. There can be no assurance that this "go-shop" will result in a superior proposal, and Control4 does not intend to disclose developments with respect to the solicitation process unless and until its Board of Directors makes a determination requiring further disclosure.

Subject to the go-shop, a special meeting of Control4's shareholders will be held as soon as practicable following the filing of the definitive proxy statement with the U.S. Securities and Exchange Commission ("SEC") and subsequent mailing to shareholders. The transaction, which is expected to be completed in the second half of 2019, is subject to the satisfaction of customary closing conditions, including regulatory approvals and approval by Control4 shareholders.

Advisors

In connection with the transaction, Simpson Thacher & Bartlett LLP is serving as legal advisor to SnapAV. Raymond James & Associates, Inc. is serving as financial advisor to Control4 and Goodwin Procter LLP is serving as legal advisor.

43.    Rather than continuing to build upon Control4's improving prospects, the Offer Consideration being offered to Control4's public shareholders in the Proposed Transaction is unfair and grossly inadequate because, among other things, the intrinsic value of Control4 common stock is materially in excess of the amount offered given the Company's recent financial performance and its prospects for future growth and earnings.

44.     Indeed, a May 13, 2019, SeekingAlpha article entitled *Control4 Shareholders Are Getting Ripped-Off - Vote No To The Acquisition* provided the following additional details:

In short, CTRL has established themselves as a leader in the smart home automation space and has achieved fantastic growth since their IPO five years ago but still has a tremendous runway for growth ahead of them. They have grown revenue and earnings at a double-digit rate and have become increasingly profitable, with an addressable market that is expected to reach $80 billion annually by 2023.

So, What Are They Worth?

If they aren't worth the $23.91 that their acquirer, SnapAV, is willing to buy them at, then what are they worth? I don't think it is necessary to pinpoint a specific figure in order to objectively say that the $23.91 is too low, especially considering where CTRL has traded in very recent history. At the end of 2017 and again at the end of 2018, CTRL was trading in the mid-$30s.

[***]

So, let's get into the numbers a bit more. While I am not familiar enough with CTRL to run a detailed DCF analysis, I can run a simple EPS growth capitalization to ballpark what they are worth. Since 2013, CTRL has grown earnings at a rate of 58%. While I don't think that they can grow things that fast in the next five years, it is safe to assume that they can at least grow earnings by 10% annually given their execution thus far and their addressable market. If their P/E ratio at that time falls in line with the current index average of about 20, then that would yield a share price of $51. Now, we can pick among several required rates of return to discount that back to today for a present value. Let's go with 15%, which is pretty high. That would give us a share price of $25.62, a 7% premium to what SnapAV is willing to pay. We can even fiddle with all these values to paint a clearer picture of how low SnapAV is valuing the company:

| Annual EPS growth | P/E | Rate of Return | Present Value | Premium to bid: |
|---|---|---|---|---|
| 15% | 15 | 12% | $27.39 | 14% |
| 10% | 25 | 15% | $32.03 | 34% |
| 12% | 20 | 10% | $35.02 | 46% |

I chose the EPS growth rates because I think those are reasonable ranges for a small growth company like CTRL (it is also feasible that CTRL could handily crush those numbers). I chose those P/E values because they represent CTRL current P/E (15), their five-year average P/E (47) minus a bunch to be conservative, and the current P/E for the S&P index (20). I selected 10%, 12%, and 15% as required rates of return because those would all beat the long-term historical average of the index as measured by the S&P. In every case, CTRL is worth more than $23.91.

But what do other people think? According to MarketScreener, the price target among the 9 analysts that follow CTRL is $25.9, an 8% premium to the SnapAV valuation.

45.     Under the onerous terms and conditions of the 30-day "Go-Shop" provisions of the Merger Agreement, which expired at 11:59 p.m. New York City time on June 7, 2019, Raymond James contacted "70 potential bidders (comprising 35 strategic parties and 35 financial sponsors, including Parties A, B, and C), which resulted in four potential bidders each entering into a confidentiality agreement with the Company (including Party A). Neither of Parties B or C elected to participate in the go-shop process. Each of the four parties that entered into a confidentiality agreement with the Company was provided access to an online data room containing nonpublic information regarding the Company and the opportunity to have access to Company management." Proxy at 50.

46.     Not surprisingly, Control4 "has not received any alternative acquisition proposals, including from any of the four parties that entered into confidentiality agreements each of whom subsequently confirmed they were not interested in pursuing an acquisition of the Company. Upon the expiration of the go-shop period and in accordance with the terms of the merger agreement, the Company ceased all such activities and became subject to customary "no-shop" restrictions on its ability to solicit acquisition proposals from third parties or to provide information to and engage in discussions with a third party in relation to an alternative acquisition proposal, subject to certain customary exceptions to permit the Board to comply with its fiduciary duties." *Id.* at 49-50.

**The Preclusive Deal Protection Devices**

47.     To the detriment of Control4 shareholders, the Individual Defendants agreed, in the Merger Agreement, to certain onerous and preclusive deal protection devices that operate

14

conjunctively to make the Proposed Transaction a *fait accompli* and all but ensure that the Proposed Transaction is consummated and that no competing offers emerge for the Company.

48.     Section 5.2(a) of the Merger Agreement provided that Control4 could solicit bids under the following conditions: (i) Control4 provided to SnapAV any information not previously provided to SnapAV concurrently with (and in any event within 24 hours after) the time it is furnished such information to any third party; (ii) Control4 is not permitted to reimburse the expenses of any third party; and (iii) Control4 pays SnapAV a $10 million termination fee.

49.     Section 5.2(b) of the Merger Agreement is a restrictive no-shop provision that prohibits the members of the Board from soliciting proposals relating to alternative offers or business combinations.

50.     The Merger Agreement also includes a strict "standstill" provision which prohibits, except under extremely limited circumstances, the Individual Defendants from engaging in discussions or negotiations relating to proposals regarding alternative acquisitions or business combinations.

51.     Section 5.2(b) of the Merger Agreement requires the Board to provide SnapAV with written notice of any Acquisition Proposal within twenty-four (24) hours of its receipt.  Section 5.2(c) required the Board to provide prior written notice within three (3) business days of its intention to terminate the Merger Agreement in favor of any Superior Proposal and negotiate with SnapAV following SnapAV's receipt of notice, so that SnapAV has the opportunity within three (3) business day to adjust the terms and conditions of the Merger Agreement so that the Company Acquisition Proposal ceases to be a Superior Proposal.

52.     In addition, the Merger Agreement provides that the Company will be required to pay Parent a termination fee of $20 million with respect to any termination under the No-Shop provisions of the Merger Agreement.

53.     Ultimately, these preclusive deal protection devices restrained and continue to restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company. The aggregate effect of these preclusive deal protection devices, viewed in light of the materially inadequate consideration offered for Control4 shares in the Proposed Transaction, supports an inference that the Board was not acting in good faith in approving the terms of the Merger Agreement.

54.     Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that the Company's shareholders will continue to suffer absent judicial intervention.

**The Proxy Omits Material Information**

55.     On June 7, 2019, Defendants filed a materially incomplete and misleading Proxy with the SEC.  The special meeting of Control4 stockholders to vote on the Proposed Transaction is forthcoming.  The Individual Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's stockholders to ensure that it did not contain any material misrepresentations or omissions.  However, the Proxy misrepresents or omits material information that is necessary for the Company's stockholders to make an informed voting decision in connection with the Proposed Transaction.

56.     The Proxy fails to provide enough information regarding: (i) financial projections for the Company; (ii) analyses completed by Raymond James; and (iii) potential conflicts of interest on the part of Raymond James.

57.     First, the Proxy fails to disclose all line items used to calculate Adjusted EBITDA, as described in fn 3 at Proxy 57.  Moreover, the Proxy omits a reconciliation of all non-GAAP to GAAP metrics.  Defendants' failure to disclose all line items used to calculate Adjusted EBITDA and provide a GAAP reconciliation renders the Proxy materially misleading.

58.     Second, the Proxy omits material information regarding the financial analyses conducted by Raymond James.

59.     With respect to the *Selected Public Companies Analysis*, the Proxy fails to disclose the individual multiples observed for each of the eight selected companies. *Id.* at 60-61.

60.     With respect to the *Selected Transaction Analysis*, the Proxy fails to disclose the premiums paid in each of the selected transactions. *Id.* at 61-61.

61.     With respect to the *Discounted Cash Flow Analysis*, the Proxy fails to disclose: (i) estimated terminal values; (ii) why a range of exit multiples of 10.0x to 13.0x was observed; (iii) underlying inputs and assumptions for using the discount rates ranging from 11.25% to 13.25%; (iv) underlying inputs and assumptions used to calculate the perpetual growth rates ranging from 3.0% to 5.0%; (v) the existence of net debt; and (vi) the number of fully diluted shares of Control4 common stock. *Id.* at 62-63.

62.     These key inputs are material to Control4 stockholders, and their omission renders the summary of Raymond James' *Discounted Cash Flow Analysis* incomplete and misleading.  As one highly-respected law professor explained regarding these crucial inputs, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation."  Steven M. Davidoff, Fairness Opinions, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount rate, and the terminal value…" *Id.*  As Professor Davidoff explains:

> *There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value.  For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars*….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques.  *This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion **unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices***. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78 (emphasis added).  Without the above-mentioned information, Control4's stockholders cannot meaningfully evaluate for themselves the reliability of Raymond James' *Discounted Cash Flow Analysis*, make a meaningful determination of whether the implied equity value ranges reflect the true value of the Company or was the result of an unreasonable judgment by Raymond James, and make an informed decision regarding whether to vote in favor of the Proposed Transaction.

63.     Third, the Proxy fails to fully disclose details of the work Raymond James performed for SnapAV and its affiliates prior to working on the Proposed Transaction, and the fees paid to Raymond James for the aforementioned work. Proxy at 64.

64.     Defendants' failure to provide the foregoing material information renders the statements in the Proxy false and/or materially misleading.

65.     In sum, the omission of the above-referenced information renders the Proxy materially incomplete and misleading, in contravention of the Exchange Act.  Absent disclosure of the foregoing material information prior to the upcoming stockholder vote concerning the Proposed Transaction, Plaintiff will be unable to cast an informed vote regarding the Proposed

Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## CAUSES OF ACTION

### COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9)**

66.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

67.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any Proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

68.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that Proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

69.     The omission of information from a Proxy will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

70.     Defendants have issued the Proxy with the intention of soliciting the Company's common stockholders' support for the Proposed Transaction.  Each of the Individual Defendants

reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things: (i) financial projections for the Company; (ii) analyses completed by Raymond James; and (iii) potential conflicts of interest on the part of Raymond James.

71.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to the Company's stockholders although they could have done so without extraordinary effort.

72.     The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading.  The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that Raymond James reviewed and discussed its financial analyses with the Board, and further states that the Board considered the financial analyses provided by Raymond James, as well as its fairness opinion and the assumptions made and matters considered in connection therewith.  Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the Merger Agreement.  The Individual Defendants knew or were negligent in not knowing that the material information identified above

has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.  Indeed, the Individual Defendants were required to, separately, review Raymond James analyses in connection with their receipt of the fairness opinions, question Raymond James as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

73.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.  The preparation of a Proxy by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and preparation and review of the Company's financial projections.

74.     Control4 is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

75.     The misrepresentations and omissions in the Proxy are material to Plaintiff, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Stockholder Vote.  Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

### (Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)

76.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

77.     The Individual Defendants acted as controlling persons of Control4 within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Control4, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

78.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

79.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.   The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in preparing this document.

80.     In addition, as the Proxy sets forth at length, and as described herein, the

Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

81.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

82.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

83.     Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Stockholder Vote or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

B.     Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

C.     Awarding Plaintiff the costs and disbursements of this action, including reasonable

attorneys' and expert fees and expenses; and

    D.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: June 20, 2019                    **Monteverde & Associates PC**

By:   */s/ Juan E. Monteverde*
           Juan E. Monteverde (JM-8169)
           The Empire State Building
           350 Fifth Avenue, Suite 4405
           New York, NY 10118
           Tel:(212) 971-1341
           Fax:(212) 202-7880
           Email: jmonteverde@monteverdelaw.com

           *Attorneys for Plaintiff*

**OF COUNSEL:**

**ADEMI & O'REILLY, LLP**
Guri Ademi
3620 East Layton Avenue
Cudahy, Wisconsin 53110
Tel: (414) 482-8000
Fax: (414) 482-8001
Email: gademi@ademilaw.com

*Attorneys for Plaintiff*